We're all glad that it turned out to be a sunny day, quite to our surprise. We only have two cases on the docket this morning, but we still have time constraints in order to be fair to everybody. So pay attention when the yellow light comes on. You have two minutes when the red light comes on. We ask you to conclude your argument. We appreciate the record citations when you have those at hand. With that, we will call the first case of the morning, No. 18-40036, United States v. Perez-Ceballos. Mr. Reynal. Good morning. May it please the Court. Andino Reynal, appearing for Silvia Beatriz Perez-Ceballos, who is present and seated with me at council table today. Your Honors, I have some unfortunate familiarity with this area of law. As an assistant United States attorney in Houston, I was the lead prosecutor in United States v. Davis. After a week-long trial, the jury convicted Grady Davis of eight counts of bank fraud. But you know about the banks. I do, Your Honor. The jury convicted Grady Davis of eight counts of bank fraud. The sole issue on appeal was whether I had successfully proven the financial institution element. This Court found that I had not. I was going to say, this is not a true confessions place here. In doing so, this Court wrote that, I quote, this Court has admonished the government to exercise care in satisfying its burden of proving the financial institution element in prosecuting bank fraud and other bank-related offenses, lest it suffer a reverse conviction on a seeming technicality. We summon these exhortations once more as we compare the proof the law requires with the evidence the government presented to the jury in this case. It seems not much has changed, Your Honors. Since Davis was decided in 2013, the U.S. Supreme Court has twice clarified the elements necessary to satisfy Title 18 United States Code Section 1344.1 and 2. First in Lugren, decided in 2014, and then in Shaw, decided in 2016. Both of those cases stand for the proposition that, in order to prove its case, the government must show that the bank stood at the center of and was a target of the defendant's scheme or artifice to defraud. In this case, the government concedes that this was a 1344.1 prosecution. See the government's brief at page 22. That the financial institution charged was J.P. Morgan Chase Bank. See the jury instructions and the record at page 1218. And finally, that Ms. Perez-Ceballos made no misrepresentations to J.P. Morgan Chase Bank. And that's found at the government's brief at page 2. Accordingly, this conviction must be reversed for lack of jurisdiction and for insufficient evidence. This outcome results even if we accept the government's espoused theory of liability, which can be found on page 22 of its brief, that Ms. Perez-Ceballos' intent was to trick Sun Life Financial Bermuda into accepting her money and Chase Investment Services Corp. into rendering services or advising her on how to invest her money. This theory of liability fails ab initio because neither Sun Life Financial Bermuda nor Chase Investment Services Corp. is a financial institution, much less the financial institution that the government charged as being the victim in this case. Now, who testified for the government on the question of jurisdiction and the fraud? The closest the government came was Mr. Paul Arnold. Right. And, Your Honor— You say the closest. Is he the only one? He is the only one, Your Honor. And if we look at page 1693 of the record, I asked him on cross-examination. And so the account that she opened—and again, I'm sorry, this is lawyer stuff— but the account that she opened and the documents that she gave you and the conversations that you had were in connection with opening up an account at Chase Investments and not FDIC-insured. His answer, correct. Okay, question, and Sun Life certainly is not FDIC-insured, is it? Answer, no. Yes. The government seeks to salvage this situation by inviting this court to contravene Supreme Court precedent in the form of Lugren and Shaw, as well as this court's own prior rulings in Schultz, Davis, and other cases, and to find that so long as the government shows some speculative risk of regulatory liability to a bank— Who said it was speculative? Your Honor, our position is that— That the bank is helping to do international money laundering. Your Honor, two points on that. First— I know she was acquitted of that technically, but the jury is not required to close their eyes to the circumstances that would have involved the banks. Well, if the government's theory—the government's theory on appeal is that her scheme was to live off the radar by having her funds in an offshore account. More specifically, however, on this point, there was no evidence that the money was stolen. In fact, the jury, on a preponderance of the evidence standard, found no forfeiture. And Judge Ramos, at the sentencing, said that she wouldn't even consider the money stolen for purposes of the sentencing using a preponderance standard. If Your Honors would like to see what the government argued in terms of risk of loss to the bank, they asked Mr. Arnold—and this is on page 1690. This is the closest they come to asking about a risk of regulatory liability. Question. Does J.P. Morgan Chase and Morgan Stanley—and bear in mind, Your Honors, that Mr. Arnold doesn't work for J.P. Morgan Chase— in your experience have to follow a lot of rules set forth by the OCC, the SEC, and governmental entities? Answer, absolutely. Question. And if the bank doesn't follow those rules in your experience and your training, if the financial advisor or the bank personnel doesn't follow those rules, could a lawsuit occur? Answer, absolutely. Could violations with the bank regulators occur? Yes. Could the bank be fined because of those violations? This brief question and answer tells us nothing about what rule— Well, you know very well that at the minimum it's the currency transaction reporting rule, right? Well, for J.P. Morgan Chase, as the— She transferred—she opened the account at Chase Bank. She put in nearly $2 million, and then at some point after that, she transferred that into the offshore account, right? That's correct, Your Honor. And Chase would have had to fill out a currency transaction report, would they not? Because it's more than $10,000. Well, I think— Now don't be vague. I'm not trying to be vague, Your Honor. I can certainly brief the transaction reporting requirements. No, I'm not. But in this case, the money was transferred in from UBS. It wasn't any type of a cash deposit. It was a wire in from UBS in Miami and a wire out. And there's nothing in the record that suggests that J.P. Morgan Chase did or didn't do anything that they were supposed to do in regards to that. No, I'm not saying that. But what I am saying—and I'm not an expert on CTRs, but we've had a few appeals. And they—you know, you have to—the bank has to fill out certain information in connection with those precisely because the government is allowed to scrutinize such transactions. And, you know, she made a raft of misrepresentations about her residence, whether she was the sole owner of the account. She said she was separated from her husband. She was not a politically exposed person. These were the—funds were from the sale of a consulting business. And then she falsely claimed that either—that she was a resident of Mexico or—I forget which one is false at which time, but anyway. Your Honor, the government concedes that none of those misrepresentations were made to J.P. Morgan Chase Bank. I understand that, but that meant that J.P. Morgan Chase, had they filled out a CTR, might well have been filling out false information. It was up to the government, Your Honor, to produce that evidence at trial. Oh, you think so? This court in United States v. Sprick—I can get the citation for that—in 2000 found that the government has the duty to come forth with more than simply a suggestion that there could be some civil liability. The government has to point to the rule and articulate how it was violated in the case sub judici. And as I said, the U.S. v. Sprick citation I'll have for you in a moment, Your Honor. You can do it on rebuttal. Thank you, Your Honor. United States v. Sprick is 233 F. 3rd, 845, and that's Fifth Circuit, 2000. The government seeks to salvage this situation. The situation that is caused by the bank not being the target, even if we were to assume that some CTR existed, that still doesn't make J.P. Morgan Chase Bank the target of any scheme or artifice to defraud. The government seeks to salvage the situation by pointing to a line of cases that come first out of the First Circuit and that predate Lugren and Shaw and I would argue contravene this court's own prior precedent. Those cases are all loan cases, and they include Brandon, Walsh, Key, and Edelkind. All of these cases, since they concern loans, could easily have been prosecuted and justified under 1344 subsection 2, which does allow misrepresentations to third parties to result in liability for bank fraud if it results in money coming from being stolen from a bank. The other cases that the government cites are forged check cases, and those cases are Lilliege, Brandon, and Baraket. In fact, the only case that the government cites in support of its theory that comes from this circuit is Baraket, and Baraket is readily distinguishable. In Baraket, the defendant befriended women and had them deposit forged and altered checks into their own bank accounts at FDIC insured institutions and then pay him with those proceeds. On appeal, he argued, I only meant to defraud the women. I never meant to defraud the bank. This court disagreed and found him liable under 1344.1. In so doing, this court presaged what Shaw would say in 2016, which is the bank must be the victim, but it doesn't necessarily have to be the only victim. These cases all stand for the proposition that the bank must stand at the center and be the target of the fraud. In Lugren, the Supreme Court wrote that 1344.1 includes the requirement that the defendant intend to defraud a financial institution. Indeed, that is 1344.1's whole sum and substance, and for that proposition, they cited the brief of the Solicitor General of the United States. This is 2014. In 2016, the Supreme Court said that a statement to a third party meant to obtain property under the care, custody, and control of a financial institution would not necessarily amount to a violation of 1344.1, although it would amount to a violation of 1344.2. I understand your client is here in the courtroom. I understood her release date is the 10th of November of this year. That was a docket entry made in error. She was released. She had received a 10-month sentence and was released, I believe, around Christmas. They docketed a different person's surrender under her docket number. The page had nothing to do with her. The caption had nothing to do with her. So released in December of 2017? I believe February of 2018. And what is the length of her supervised release? Three years. Which brings me to my second point of error. In this case, I submit, Your Honors, that the prosecutor in her closing argument materially, intentionally, and presidentially misrepresented the record to the jury and used an exhibit that she cobbled together by taking two disparate documents and putting them together. Were you the trial attorney? I was, Your Honor. It looks to me as if, even if that was an intentional error, you were able to capitalize on it very favorably. Not favorably enough, given that the jury convicted my client of bank fraud, Your Honor. And I can just point, Your Honors, to the record at 34. But did they indicate any potential confusion? They asked for that testimony, the testimony to be read back on the issue of Paul Arnold's testimony to be read back. And Your Honors can find the statements that accompanied that on page 3483 of the record when the prosecutor, discussing the altered UBS documents, states, and then October, same thing, October 2013, looks exactly the same. Looks exactly the same when they went to J.P. Morgan Chase. Okay. You have time for rebuttal. Thank you. Ms. Atkins, were you the trial attorney? No, ma'am. Good morning. I didn't think so. This is all very new to me. I've been on it a few months. Good morning. May it please the Court. My name is Jessica Atkins, and I represent the United States. In this case, the purpose of the bank fraud statute this defendant was indicted and convicted of is to protect the interests of the federal government when they're the insurer of financial institutions. So then it becomes the bank's job to measure the safety and the soundness of their clients and companies and to verify that these are viable. And they do this by gathering information from their clients and companies, and they depend on that information to assess their risk. I realize this is obviously a very large trial and lots of evidence due to the money laundering and the bank fraud, and I thought it might be beneficial to just take a few quick minutes to narrow this bank fraud down, because we really are only talking about a five-month period in three banks that implicates this particular count that she was convicted of. So it starts in May 2013 until October 2013. At the end of May is when the defendant comes to the United States. She says in her own testimony she never goes back to Mexico. She is thus a U.S. resident at the end of May of 2013. Early June 2013 is when her husband is arrested, and subsequently UBS learns of that information. UBS's account is a joint account, and it's a PEP account. So that account appears to be on the up and up at that point. Where the fraud begins is the transfer from UBS to the Chase savings account. At that point, the defendant has opened a Chase savings and a Chase checking account in early June 14, 2013. Between June and August, the defendant contacts the branch manager of her Chase Bank, FDIC Bank, where she has the checking and savings. And if you look at the record at 1617 to 1618, Paul Arnold discusses the conversation he has with that branch manager. The branch manager conveys, I have a client. She is a nonresident. She wants to open this particular case, kind of account, pardon me, that you have. And what Paul Arnold said was so important is you can't live in the United States and open that account. So right there, the representation from the bank manager to Paul Arnold is this is a nonresident. She's not going to pay taxes. She wants to open an account. So then when he gets involved in August of 2013 is when a lot of misrepresentations start flowing. First of all, and obviously the most egregious, is giving two different bank statements that are falsified by deleting her husband's name, thereby having no investigation of him and basically saying she's separated and not married. So we're going from a joint account, and she admits freely in her testimony, and actually a defense attorney even says it in opening that he was exposed. She wanted it to be a sole account and basically wanted to get away from him. Now, those are personal reasons, but those are also illegal, going from a joint account to a sole account without that person's permission and also not giving the marital status, not giving the PEP status. And you see her intent when she starts to close the account at UBS. Sonia Fernandez testified. She wanted a cashier's check. She specifically said, can I just give this money to a third party? Can I give it to another company? She was already trying to dodge that money and get it away from her husband because, obviously, he's the flag. If his name is associated with any of this, it's going to trace back to his charges in Mexico, which is why UBS exited the relationship in the first place. Why did Arnold tell the woman at Chase that the nonresident couldn't open this kind of account? What are you talking about? He said that the reason he accepted the call from the branch manager and met with the client was because the branch manager said she was a nonresident. Paul Arnold's point was that he would only be doing accounts for people who were nonresidents. Had she said she was a U.S. resident, which she was, he wouldn't even have met with her. That's not a legal matter. That's just the way they were organized, right? Correct. That is correct. And so he did further expand on that in that the reason he went forward with it with Sun Life was she met all the qualifications. And so but for the Chase savings account, the money would have never gotten to Sun Life. In fact, if you check her bank statement on the savings account of the Chase FDIC insured bank on 3759, it shows very clearly that $1.9 million was deposited on October 16th, 2013. It was there in her Chase savings account from nine days until October 25th, when it was then moved to Sun Life, based on all of her representations that she was a person that could have the account at Sun Life, which she was not. Let's back up a little bit to the conversation between the Chase Bank, whoever that person was, and Arnold, because Arnold was with Chase Investment, correct? Correct, Your Honor. Why was the person at Chase Bank early on contacting Arnold at Chase Investment? The testimony shows that the branch manager said that the defendant approached him and wanted a referral for investment services. And because she already had a checking and savings at Chase, she went to her local branch bank. That man, his name is not in the record, I believe, but that man then referred her to Paul Arnold to look into the investment account for non-residents. So by about October 2013 is the time she gives the second false statement when she solidifies these four lies, which are the U.S. resident, which she is. She says she's not. She continues to use the address in Mexico. She says she's separated and never gives information about her husband. She puts on the form and says in person that she is not a PEO. But those misrepresentations were not to Chase Bank. That's correct. The non-resident was, actually, because I think she made that representation to the branch manager to even get the referral. But you're correct. Those misrepresentations were made to Paul Arnold. Well, didn't the government concede at trial that she didn't make any misrepresentations to Chase Bank? Yes, and I think that those are overt statements. I think the conversation with the branch manager is just an inference that the jury could have made that that's how they got connected was I have this information about this woman. I passed her along to you because she said she's a non-resident. But, sure, we didn't rely on that. We really relied on all the information given to Paul Arnold that he used to then have the money transferred to UBS to the savings account. And, of course, Paul Arnold, again, just for our recording, was not with Chase Bank. That's correct. He's with Chase Financial Services. So why didn't you have someone from Chase Bank carry the water in this case? I think the testimony reads that sometimes they do and sometimes they don't. Perhaps it would have been more clear in the record had they done that, but I don't think I could speak on the procedures. They who? Paul Arnold said that. The bank or the government? The government bears the burden of proof here, not Chase Bank. That's true. I believe because we're relying on the case law that says it doesn't have to be intended to a specific bank. We're just in the chain of banks. I understand you're in the chain, but why don't you move on to what's the risk of exposure to the bank as shown in the record? Okay. So there — it's twofold, I believe. There's evidence regarding — well, first of all, I think the biggest thing is these falsified documents, that she is taking money that she's not all entitled to because it is legally — But Sun Life and Chase Investment have no — are separate entities from Chase Bank. That's true. This is not the schema or artifice, right? This is not subsection 2, schema or artifice to defraud, right? Scheme to defraud is part of section 1. I understand that. But, I mean, are you conflating the two? I don't believe so. I think my purpose in separating the two — Scheme to defraud Chase Bank. Yes. And Chase Bank has to be the victim, so explain how Chase Bank is a — Whether he was in FDIC or not, there's plenty of case law that says the actual misrepresentation doesn't have to be to the FDIC bank if the FDIC bank is harmed. Well, I understand that. If his account was doling out — you know, if they were — if she had been defrauding Arnold personally out of money and she used his bank account, I mean, of course. But that's not what happened here. No. It really was that Chase Savings was the holding pattern to get her where she wanted to go, which was Sun Life. And that money being — The money's still in Sun Life, so Sun Life can cancel the account if they want. But who's been defrauded here? Both. All of them. I believe both were. Everyone was told lies here. Yeah, well, okay. Well, lies are not bank fraud. So tell us again how Chase Bank is — what's your best case for implicating Chase Bank in the fraud? Okay. I think that there are several cases from this circuit and the ones that I cited in my brief from the 1st, 2nd, and 11th Circuit. The two best 5th Circuit cases for our position are Barcolette and McDowell. Both state that the statement doesn't have to be made to the FDIC bank as long as the FDIC bank was affected by risk of loss. Well, in Barricade, it was affected because the women were taking money out of their own accounts, right, at the bank. That's true. But I think the overall census that you see in those cases is the custody and control of the money is what puts you at risk. And I would say, had this money never gone to the Chase savings account, I don't think we'd be here. It's about the care and custody of that control going to that bank and then going somewhere else. And we're proving that J.P. Morgan Chase is the FDIC for having that money for the nine days was causing the risk of loss in this case. What was the risk of loss? The risk of loss is twofold. One, that she didn't completely own all the money, that she misrepresented the money belonged to her in a joint account. Well, excuse me, but Mexico is a community property state, right? Sure. She has, if it's like Texas, she has the ability to control what's in a joint account. I think that's true, Your Honor. I will say I think there's a difference. And when you have a joint account, each person can pull all the money out, and that's fine. But that isn't what she did. She made a false representation to someone else that the money was only hers, and the point was because he would flag the account and no bank would touch it. So she knew she had to delete his name for this process to even happen. And to your second point, Judge Rartstil, it's not just that other people were implicated and they may have a right to the money, whether that be her defendant or the Mexican government, but also that they could incur fines. There's testimony about the things that banks have to do, especially with a PEP account. Those are high-risk accounts. They would have to go through more paperwork. There's a larger-scale investigation of people involved. That wasn't done here because she lied. And Paul Arnold specifically said had she been truthful about these things, she would have never become a client of Sun Life, pardon me. That money would have never been funneled to Chase Savings to even go to Sun Life. But that's not risk of loss. You know, you tried her for money laundering. You lost. And you tried her for bank fraud. You started out with three banks. At the end of the government's case on their Rule 29 motion, we got rid of two of those banks, leaving Chase alone. It's a mighty thin reed you're standing or resting on. Very true. It's a very simple. This has all come down to just one small point. But we can't ignore the fact that this money went to an FDIC bank based on false representations and put them in risk of civil liability, which is very clear. Civil liability to whom? To possibly the Mexican government or the husband who has a right to part of the money. UBS statements showed he was putting in money. Oh, come on. This business about separation sounded to me like a total farce. It just sounded to me like a—I mean, you know, you're trying to have it both ways. She's, quote, separated from her husband. Is she really? Your Honor, I can't speak to that. But I do know that if a person has a joint account, they have a right to it. And that it's risk of civil liability. We don't have to show that there was a lawsuit. And I think I pointed that out in my brief in response to theirs. But it also is— and Mexican citizens from being defrauded. I can't tell you how reassuring that is to me. It's also the risk of the fines and the statutory fines that a bank incurs. What fines? Well, that's what I asked you about five minutes ago. What—you know, I was talking to him about currency transaction reports. What testimony is there in the record about this with regard to Chase Bank? Paul Arnold testified—pardon me—about statutory fines and things that banks can incur if they're not given the right information. The majority of that really falls on the PEP status, that they are high risk. And had she disclosed that, the bank would have done a different investigation. Obviously, they would have found the information about her husband and the funds, and they would have never taken it. In fact, to use as an example, Paul Arnold talked about how Sun Life had to change their policies because a lot of banks weren't getting the correct information. So I think that he did give pertinent testimony to the risk of the bank to fines that can be up to $1 million when they don't exercise due diligence. And his point was it's increasingly harder for a bank to perform their due diligence when they're getting false information from a client. And I think they took her at her word for everything she said and moved this money along. But you conceded there were no false representations when she opened the account at Chase Bank. The Chase Bank. Other than her signature card that says that she's a nonresident, which is really what started the whole thing with the bank manager moving her case along and saying, oh, she's a nonresident, she can have this particular kind of case that she— or account that she don't pay taxes on that is only for nonresidents in the United States. So that is on her signature card, and she did say, I don't live here. But I thought you conceded that there were no false representations to Chase Bank. I suppose I meant overt the statements that she made to Paul Arnold. That's just a written signature card. So I don't have any testimony about her meeting with Chase bankers. Paul Arnold is not Chase Bank. That's true. I think the government in this trial kept trying to kind of fudge between Chase Bank and Chase Investment. Paul Arnold is not Chase Bank. It's very interesting that instead of having a Chase Bank employee testify, you had a Chase Investment employee testify. I agree, Judge. That would have made a cleaner record. I can't speak to the trial on why that wasn't done. It would have been a little cleaner to have that. I don't think it renders the evidence insufficient based on the case law that says the statement doesn't necessarily have to be to the FDIC entity. Yes, do I agree it would have been cleaner and easier to follow. Yes. But it doesn't render the evidence insufficient under Fifth Circuit case law. I see that I only have a few minutes left. Would you like me to speak on the third issue about the prosecutorial misconduct? Sure. In this case, the defense attorney quickly spoke about the PowerPoint slide that the prosecutor used in closing argument. The defense attorney did not object to that statement. In fact, he used it in his own closing, so any error would be on plain error. I think that the government has agreed that it could have been a misleading slide, but the defendant's own closing argument specifically said he didn't think it was intentional, and he actually asked the jury to go back and look at that testimony. And I think this is a good jury. This was a hard case. It was very confusing, lots of different counts. And the jury actually listened to the defense counsel. They went and asked for Paul Allman's testimony. They reviewed it. And then only then did they come back and find her guilty of the bank fraud but not guilty on the money laundering. And so I think this is a situation where the jury actually was listening. They were pertinent to the arguments. They were charged on the fact that. Well, you're an officer of the court, and I think you have to agree that as cobbled together, this exhibit gives a very misleading impression on a crucial issue in the case. And as an officer of the court, can you explain how this happened? I can. And I agree with your sentiments about it, that it can be misleading. And personally looking at it, I think it possibly could just be that the documents were so close together that they read as one. So I have two thoughts about that. And one is if you. What do you mean so close together? I mean, you can't be at the top of one and the bottom of the other. I mean, close together doesn't. I don't understand that. Okay. So I'll explain. I think that if you look at her entire PowerPoint, it's 125 slides. And if you look at that with the closing argument, the first half of the PowerPoint is all just the financial documents. The second half is her summarizing witnesses' testimony. And this slide is very consistent with all those slides in where she put the bullet points on the side with the subject matter she wanted to cover, and then she put pieces of documents up. And if you look past that page, which the PowerPoint is at 4397 until 4428, it shows a consistent pattern that the prosecutor was summarizing testimony with the bullet points, and then you'll see it on other slides, she'll put up one or two documents to sort of prove those points. So what I meant by close together was on this particular slide, she seems to be putting a lot of information there, and because they're pushed together, I think that might be what gives it the appearance of it being one document. She never said that it was, but I agree it probably wasn't the best practice. But he didn't object to it. He didn't have a problem about it. He used it in his rebuttal to get the jury to go back and look at the evidence, which ended up working because they did. So in that sense, I don't think there's anything about it that was purposely improper. I think possibly it may have been a poor graphic design, but it is consistent with the rest of the PowerPoint. So I would urge you to go look at all 125 slides and just review that they're all consistent in the same manner. If you don't have any further questions for me, the government would ask that you affirm the conviction in this case. Thank you so much. Thank you. All right, Senor Reynald. Thank you, Your Honor. Briefly, we did a word search through the record in the case, and the term CTR, or Currency Transaction Report, was not mentioned. And I won't belabor the point, Your Honor, but also it appears that CTRs are triggered by cash deposits over $10,000. So this wouldn't have triggered a CTR. Well, a wire transfer would be a, I thought, never mind. That's a red herring. What about, I mean, had she gone to Chase Bank and tried to open the account and said, you know, my husband was the chief finance officer of Tabasco or wherever it was, they wouldn't have allowed it, right? I disagree, Your Honor. There's absolutely nothing to that point. It's not in the record? It's not. And I think what is the two things, number one, to open up her Chase account at her Sugar Land branch bank, there's no questions about PEP, there's no questions about who your husband is. None of that information was asked of her in June. We also oppose the government's position here that she became a resident of the United States the moment that she set foot in this country. This issue that now she's misrepresenting her residency to the J.P. Morgan Chase Bank, this is the first time I've ever heard of this in this entire trial. That's a $1.3 million pedeter, right? Well, Your Honor, she'd come and left from the United States multiple times over the years before. That was shown. She'd only been in the United States for less than a month at the time she opened up this account. I think that to say that somehow we should infer now when it was never argued to the jury and it wasn't even argued in the briefs that she was misrepresenting her residency to the J.P. Morgan bank officer, I would add Paul Arnold at the time of trial did not work for J.P. Morgan Bank or Chase Investment Services. He worked for Morgan Stanley. Nobody was called that works currently for J.P. Morgan Chase, Chase Investment Services, or any other Chase-associated entity. I'd like to address the issue of whether she was stealing the money from her husband. If Your Honors look at the UBS bank account, it was not a joint account. She was the owner of the account. The testimony at trial was that it was her money. She added him as a signatory on the account, as many people do, so that he could have access to it if he said. That would be very difficult to prove under Texas community law, don't you think? That she couldn't transfer the money? Absolutely. That it's your sole property, but I added my husband on so he could draw. Give me a break. Oh, no, but the government's point here that, and again, never presented to the jury, only argued for the first time here at oral argument, and that would be a fraud on UBS. It wouldn't be a fraud on J.P. Morgan Chase. The fact is that's a red herring for the court. She was the account owner. I think there are red herrings all over the place here. It's beginning to smell funny. So I wanted to raise that point. Again, the government says J.P. Morgan Chase relied on Arnold and on the documents. There is no evidence of that. They concede in their brief that none of her misrepresentations went to J.P. Morgan Chase Bank. The record supports that none of her misrepresentations made their way to J.P. Morgan Chase Bank, that they were all confined to Mr. Arnold who worked for Chase Investment Services, yet the government, again, is trying to conflate the truth. No evidence in the record that a branch would ask about PEP status. And finally, on the issue of prosecutorial misconduct, I think it's important. I didn't object at the time, and that's because, frankly, I was shocked, and I wanted to be sure of what I was saying before I said it. But looking at this in retrospect and looking at the pattern of prosecutorial misconduct in the case, which included perjured testimony, threatened witnesses, and a variety of other malfeasance by the government, we are convinced at this point that this was done intentionally to muddy the waters and to encourage the jury to reach a verdict on an inappropriate ground. That's a pretty strong accusation against your recent employer. And a former colleague. And I don't say it lightly, and I don't raise prosecutorial misconduct claims on appeal as a matter of course. In this case, it was there. I mean, the e-mails that we got during trial from the case agent saying, from witnesses to the case agent saying, the prosecutor, I feel that the prosecutor is threatening me to change my testimony. Those e-mails were Brady, and they were Giglio, and they should have been turned over to us. But your point on appeal is not about that. Your point on appeal is solely on the PowerPoint, even though you talk about the others to, I think in your brief, you say to give background. Correct, Your Honor. I believe that our case law states that in order for the claim to be actionable, the misstatement must be material, intentional, and prejudicial. Material and prejudicial is clear from the record. Intentional requires us to look at the trial as a whole. Thank you very much, Your Honor. Quick P.S. But this is your quote, correct, during your closing statement? I don't think she did it purposefully to mislead you, unquote. That's you. Yes, that is me, Your Honor. And I've had time to reflect since then. That was said in the heat of the moment, and I, frankly, as I said, I don't take it likely to make those kinds of accusations. Thank you, Your Honor. All right. Thank you. May we be excused? Yes, sir.